Good morning. My name is Terry Kaiser Cooper. I represent the plaintiffs, and I would like to reserve five minutes if I can. If there is any doubt about what happened at May's barbershop, we hope the panel will look at the videotape provided. It is the best evidence of what actually happened that night. The reason the video is so important is it totally disproves, discredits the defendant's arguments regarding exigent circumstances and hot pursuit. The defendants detonated the flashbangs as a ruse, as a trick to get everyone on the street running. The defendants manipulated the people on the street into running and then called them suspects only because they ran. There's no guilt. And where were these, I'll call them suspects with quotes around it in deference to your argument, where were these people when the flashbang went off? They were in front of the home of Michael Thomas, 200 yards away at night from Officer Tracy, the only officer who saw them. And were they clustered together as if they were somehow a unit, or were they just kind of walking past? What were they doing? They were, it's my understanding they were talking to Michael Thomas in front of his house. Okay. Okay. There's no way that Officer Tracy could have seen them, nor did he say he did see them. All he saw was running. Now, Your Honor, if... And he saw these people run into the barbershop. Well, Michael Thomas never ran into the barbershop, and there were only two people that went into the barbershop. But he saw two people from in front of the house run into the barbershop? He claimed to have seen four people, Michael Thomas and three black males. Okay. Okay. Now, if there's an explosion or gunfire on Mission Street, everyone in this room hearing what sounds like explosions or gunfire is going to run for shelter because that's a very scary kind of situation. There's no guilt associated with running if you hear what sounds like gunfire. Ms. Cooper, can you help me with the analysis? It sounds to me like you're making an Illinois v. Wardlow argument, but don't we also have to look to the existence of the search warrant that had previously been authorized by a neutral and detached magistrate, and don't we also have to consider the three-month investigation into criminal street drug dealing in and out of Mr. Thomas' house, about which apparently Officer Tracy had been briefed at the pre-raid briefing, in order to assess your argument that this was not exigent circumstances or hot pursuit? Not at all. Totally irrelevant? I think it's totally, absolutely irrelevant. Otherwise, everyone in the neighborhood, every house, every business is all ripe for running into and pointing weapons at people and putting them on the floor. I think it's totally irrelevant. You seem to be suggesting some kind of conspiracy to get the people in this barbershop. No, not a conspiracy. It was more or less fortuitous that they ran in there and the police followed them there. Isn't that good? The police did not see them run. The police were not chasing them. The police didn't even see. Picking on the barbershop. No. They had to get somebody to own the barbershop. Oh, no, no. There was no conspiracy against the barbershop. This was a complete. You seem to be suggesting that. No, I'm not suggesting there was any act, conspiracy against the barbershop. Running, what I'm saying is, under the circumstances of the police trickery, this ruse to get everyone on the street running, any human being on that street would run, does not constitute hot pursuit. Hot pursuit is when an officer is chasing somebody. They weren't chasing these people. They were running because there was an explosion, which was a ruse by the police to get everyone running. I thought that there were outstanding arrest warrants for both of the Thomases, or at least for Michael Thomas. Is that right? Absolutely. For Michael Thomas, there was an outstanding arrest warrant. He was in front of his house. The police hid and detonated these flashbangs instead of going in to arrest him. They wanted to do. Let me ask my question. Sure. Since you confirmed what I thought I read in the record, if Mr. Thomas was a wanted felon and Officer Tracy saw him run into the barbershop, wouldn't the officer have a right to pursue him in order to effect his arrest on the warrant? Absolutely. He could open the door, go right in, look around. We're not saying the barbershop is off limits to the police. The problem I'm having with your argument is I don't understand why that isn't a pursuit. If a policeman is chasing a known felon. He's not chasing him. He didn't see him run. He's going after him. He saw somebody run. Didn't he testify that he thought it was Michael Thomas? That's correct. So he has a right to go into the barbershop. Absolutely. We don't question that. Okay, to chase Mr. Thomas in order to arrest him on the warrants. Absolutely. Why isn't that a pursuit? It's not a pursuit of our clients. What we're saying, Your Honor. I'm talking about your clients at this point. Your answer earlier was all of what happened down the street is totally irrelevant. No. The investigation three months ago was irrelevant. We're saying that Officer Tracy, if he thinks he sees Michael Thomas go into the barbershop, has an absolute right to go into the barbershop to look around to see if Michael Thomas is there. Michael Thomas is a very distinctive-looking man. He's over 6'2", 270 pounds, and he's wearing all white, according to Officer Tracy. So are we now just arguing over the meaning of whether or not that's a pursuit? Let me use a more neutral word. Does he have a right to track Mr. Thomas down at that point? Absolutely. Okay. No problem. He can open that barbershop door, which is open to the public, and go in like anyone else and look for this very distinctive person. We wish that that's what he had done. Instead, he goes in there and he sees people. He knows right away when he opens that door that Michael Thomas is not there. It's a small area. It's probably about 15 by 20. Well, he can't see him at that point, right? No, the barbershop's fully lighted. He opens the door. We know, do we not, that two of the other people who ran in there were hiding in some places that apparently you couldn't see when you looked through the door, right? No. They were hiding because they didn't know what was going on. They weren't hiding from the police. They had no arrest warrants. They were innocent people out on the street. They had no reason to fear the police. They were hiding from – if you look at the videotape, you'll see a whiteout. The whiteout is the flash banks. It is scary enough that anybody hearing that would run. These are people out on the street talking to Michael Thomas. The next-door neighbor talking to Michael Thomas, hearing that noise, would run. The barbershop was one place to seek shelter. When you're running, you don't run into – maybe they could have – private residences. If we could back up a minute. The district court said that Tracy – it appeared to Tracy that all four suspects ran into the barbershop. Now, you say nobody saw anybody run into the barbershop. Officer Tracy saw, he thought, Michael Thomas and three others run in. Officer Tracy also said at different times he saw eight people run in, and another time he thought he saw two people run in. We don't have any problem with Officer Tracy or any police officer going into that barbershop and looking for someone who was so distinctive looking. They knew nothing about anybody else. Officer Tracy testified. He knew nothing about anyone else who entered that barbershop. He didn't know if they were short or tall. There was more suspects than Thomas, wasn't there? Officer Tracy saw, he said, Thomas and three others run into the barbershop. All right. Okay? At another time, he entered the barbershop. He saw one of my clients in the barber chair with a barber cape around him, and he said to him, you're one of the eight that just ran in. He put on the radio that he saw two suspects run in. We don't know what he said, but just accepting the latest argument from him, that he saw Michael Thomas and three other people ran in. He didn't know anything about those three others. He didn't know if they were short or tall, fat or thin. He didn't know their names. He didn't know if they were criminals or law-abiding citizens. He didn't know anything about them. So he goes in there, he doesn't know any of that. How does he go about checking it out? If you don't know something about the people that you're seeking, that doesn't give you the right to use an officer, the aggressive police tactics that they used. Check it out is great. We wish they would have. I wish they might be armed and shoot them. Anybody might be armed. You want to make that argument, you can say, Your Honor, that that's a high-crime area and an officer should approach every person on the street with his gun out because that person may shoot him. These people all ran. They ran because of a ruse, a flashbang. They ran because the police tricked everybody, innocent people, Michael Thomas, the whole neighborhood into running. If you were on that street, Your Honor, you would have run as well. It wouldn't make you a suspect. What's the distance between the site in front of the house where the flashbang goes off and the barbershop? A hundred yards. A hundred yards. Let's assume that these guys are not Olympic class but that they can run pretty fast. So, I don't know, what, 30 seconds to get to the barbershop? Running into a barbershop seems like an odd thing to do if all you're trying to do is to get away from something that's scary. Meaning, if I'm trying to get away from something that's scary, I'd probably run and then go down the alley and hide in the bushes. If I'm trying to get away from the cops, I'd probably run to a public place and mingle with other people. What was between them and the barbershop were private homes. They could, I suppose. Well, that's what I mean. The first place they could mingle with other people was the barbershop. Right. That's right. That's correct. But it's important to remember, Your Honor, the police were not chasing anyone when those flashbangs went off. The police are not even in sight when the flashbangs are off. The police did not cause anyone to run. Now, when the flashbangs went off, Officer Tracy thought he saw Michael Thomas and these three other black men run into the barbershop. Did he also think that he saw Amin Thomas go into the barbershop? He said he wasn't sure. He threw that name out. He said, I believe it was him. We know that that's what he said. I'm looking at page 140. He said all kinds of things. He said that at one point. So now he's looking for two people who are suspects, Michael Thomas and Amin Thomas. But he couldn't have met Amin. Why not? The reason why. Amin is 5'4", 130 pounds. That's what he is. That's what the suspect is. But the question is what the officer thought at the time. And he'd been briefed with this suspect list of people he was looking for who were known felons from prior drug dealings. And one of them was Michael Thomas and one of them was Amin Thomas. And based on the deposition testimony I just read to you, he thought that those were two of the four men who'd run into the barbershop. That's what he said. Okay. So isn't that relevant to the justification to enter the barbershop? There's no justification needed, Your Honor, to enter the barbershop. It's open to the public. We're not saying it's a private club. I understand, but the basis of your civil rights action is the manner in which the entry was effected. No, that's wrong. Okay. So it was okay for him to walk in with his weapon pointed? No. So you are challenging Amin. I am challenging the aggressive police tactics that he opened the door. That's what I'm challenging. Perhaps I misunderstood you. Maybe I'm not making my questions very clear, but as I understand the crux of your lawsuit here, you're challenging the manner in which the officers entered the barbershop. The aggressive enter. I guess I'm having a problem with the word enter. They can enter. Once they enter, it's the way they treated my clients. The manner in which they treated your clients. That's correct. I'm a little frustrated, Counsel Clinton. I'm trying to make my questions clear, but I think you and I are just not communicating very well. That happens with me.  I don't know if it's you or with me. I'm not putting the blame on you. I'll take the blame. I just want to know, so you are challenging the tactics that the officers employed, if I can use that term, used when they entered the barbershop. I'm challenging putting guns to the heads of innocent people in a barbershop when they don't know who they are. The only one. Yes. Pardon? The answer is yes. Yes. Oh, yes. All right. Okay. Now, Tracy. Because the time is running, let me try to direct you a little bit to what is of most interest to me. I'll just state it outright. I don't have much trouble with the police going into the barbershop. I don't have much trouble with the police, when they first get in there, not quite knowing, as you yourself say, how many might have gone in, two to eight, I don't know, four. Four is a pretty good number. Saying, as they're trying to ensure everybody's safety, okay, everybody down. Then I'm going to assess. That part seems to me okay. Where I start to have trouble, what they did was, I think they can tell pretty clearly that Ruby Jean May is, you know, she's operating a barbershop. And I think they can tell pretty clearly that Mr. Spears in his suit, well, I mean, why are they putting their hands in his pockets? I mean, it doesn't sound like they really need to do a Terry search on him. I mean, it's at that point that you seem to have some traction for me. But until you get there, I'm, you know, it seems to me they're acting okay. All right, Your Honor. Well, let me talk for a minute about Mr. Spears. The point that I thought was really significant is that all Tracy knew was that unknown runners had entered the barbershop after he could tell Michael Thomas was not there. The video shows the officer pointing his weapon inside the door at plaintiffs when he had no idea who any of them were. He didn't know who any of those people were. He was pointing guns at people who were unknown. Mr. Tracy determined they were unknown to him, one of them might shoot him. But he didn't know anything about them. He had no reason to believe that they were connected to any crime. Tracy knew nothing about the plaintiffs. Okay. The district court said based on these circumstances, officer safety concerns, allow the officers to search for weapons as they proceeded in their search of May's Barbershop. Do you deny they had the right to go in there and control the scene until they checked out who people were? One of them, several could have had guns. There could have been, even the owner could have been forced to hide drugs on her person. Well, anything's possible. But they didn't know those people from Adam. The plaintiff, officer Tracy determined. Is that why they had to check him out? We believe they were searching for Michael Thomas, a very distinctive young man. They knew the plaintiffs were not Michael Thomas. Those people in the barbershop were each clothed with constitutional protections. They had no reason to suspect them because they didn't look anything like Michael Thomas. The plaintiffs who he knew nothing about, he thought, could be the runners who he also knew nothing about. Only one he knew anything about for sure was Michael Thomas. He knew the plaintiffs were not Michael Thomas. He didn't know anything about the plaintiffs. They were total strangers to him. They could have been anybody in the world. He said in his deposition. They could have been the other suspects. Well, anybody on the street could be the other suspect. He had no reason to believe that they were. There were no connecting factors. He saw some suspects he thought at least were in there. And he goes in there and he looks. And he says, is Michael Thomas here? He looks all over. Is Michael Thomas around? He doesn't find him. If he wants, have the people there who he doesn't know a thing about show him ID, show him some identification. I mean, that's we don't have a problem with that. But he had no reason to believe that these people were connected to these runners who he also knew nothing about. Let me say a moment about Robert Spears because Judge Fletcher brought him up. Here we have a guy in a business suit. He's 56 years old. Clearly doesn't match anything whatever. He already knows that he is not a suspect. He already knows. He's patting him down. He doesn't match any description. He doesn't know anything about him. And he keeps him in handcuffs out in the parking lot, goes into his back pocket to take out his ID. And when he was asked at his deposition what was the reason or what reason did you have to go into his pocket and keep him in handcuffs to do a warrants check, Officer Adamson said, absolutely none. What they were on was a fishing expedition, Your Honor. This was a neighborhood in which they had done this investigation for a long time. It's clear in my view that they thought anybody there, just as Your Honor has pointed out, anybody in the world could be a suspect because they have all these suspects and they're all possibly running. But innocent people were running as well. Those two others that ran in were totally innocent. Everyone in that barbershop was. Counsel, totally innocent? Didn't one of them later admit that he flushed drugs while he was hiding inside the barbershop waiting for the police to find him? It's what the officers knew at the time. They knew nothing about him. If it later turned out he murdered his mother, it doesn't make any difference. It represented to us that they were totally innocent. That's not what the records suggest, Counsel. I think you're overstating the fact. Well, as far as a warrant out for them, perhaps I'm overstating. There was no warrant out for them. They were not on any suspect list whatsoever. Perhaps they had done misdeeds somewhere else, were intending to do misdeeds in the future. That is relevant. They hadn't been on the suspect list at any rate. They were not on the suspect list. Before you sit down, let me ask you, if you agree that the video is critical to our evaluation of the case, the city had offered, as I understood it, a CD that you objected to because it was enhanced. We looked at the videotape that was actually introduced into evidence, and it's very hard because of darkness to make out what's going on. Would you have any objection if we look at the enhanced version so that we can see better what it depicts? We would invite you to do that, Your Honor. We believe the videotape is critical. It will show that ---- Wait a minute. Do that. Look at the videotape, look at the enhanced disc, which? You can look at both. Okay. Okay. And I want to make one point, Your Honor. Why did you object to that? Because we thought it was appropriate for this Court only to consider what the district court did. That's what we did. But you're withdrawing that objection now. That's correct. We're withdrawing it now. And one final point that I would like to make is that regarding hot pursuit, the barbershop's in the middle, Michael Thomas' house is at one end, Officer Tracy is at the other. The men were running towards Officer Tracy. They didn't see Officer Tracy. They weren't running from the police. This was a total natural reaction to run at the sight of the flashbangs. And I guess I haven't reserved any time. You have not reserved any time. You owe us one minute and 20 seconds. But we'll give you a chance to rebut. Okay. Okay. Good morning, Your Honor. I'm Tom Riley from the Sparks City Attorney's Office, Sparks Nevada, representing the city and Officer Scott Tracy, who did the entry into the barbershop. The record in the deposition testimony is very clear that he saw Michael Thomas and believed he saw Amin Thomas enter the barbershop along with at least two other people. The location of the barbershop in relationship to Officer Tracy was such that it would have been easy for the Thomas' to dodge around the corner instead of following the other two into the barbershop, as he had believed was done. By their own testimony and by Officer Tracy's testimony, these four were running as fast as they could. The one, Luther Clayton, no, Rashad Maxwell, I believe he said that he was running as if his life depended on it. Well, it is not a good neighborhood over there where the raid took place. It's been a crime-ridden neighborhood. At the instance of the neighbors, the people that live in the neighborhood, which are mostly African American, a series of drug buys, undercover drug buys, was staged in Pat Baker Park by officers of the regional street enforcement team, which is a consolidated unit. The results of that investigation produced the list that we have been referring to. Every person on that list sold drugs to undercover officers. Under Nevada law, every person on that list was suspected and reasonably suspected of a felony. When Officer Tracy saw Michael Thomas, who is very identifiable with his full-length, white-down coat in the middle of the street with three others who were standing under a streetlight, by the way, it wasn't that hard to see him. He saw them standing up there when the flashbangs went off into the house. The flashbangs were not, of course, set off outside. That's not the point of a flashbang. They're set off inside. They were set off inside a house that was being rented by Michael Thomas. Now, Michael Thomas, if he was purely innocent, I would think that if somebody set off a flashbang in my house, I'd go find out what the heck was going on. But instead, they took flight, instantly took flight. And as it turned out, there was a good reason. Michael Thomas had 15 grams of rock cocaine on him when he was arrested that evening. And where was he when they arrested him? I'm sorry? Where was Thomas when they caught him? Thomas had run, Michael Thomas and Amin Thomas, had run right to the edge of the barbershop entrance and then turned and headed north along the west side of the barbershop building and were apprehended by two Reno police, no, one Washoe County Sheriff's officer and I think one Reno police officer at the residence just to the north of the barbershop after he had jumped the fence and thrown down the rock cocaine. Officer Tracy clearly had probable cause to believe that is suspected. Can I get to the chase for me? What bothers me about this case, just to say, as I think I indicated when I was questioning the other side, I don't have any trouble going in. I don't have any trouble with making everybody lie down, sort of checking, securing the area, making sure everybody's safe and so on. What seems to me that the police may have overstepped is, for example, Mr. Spears is dressed there in a business suit. Instead of saying, could you please tell me who you are, could you please hand me your wallet, against, without, I gather, at least according to one view of the evidence, without getting his permission, they reach into his pockets. So what justifies that? First justification, Your Honor, the record shows that there was a witnessed delivery of firearms to Michael Thomas' house approximately a month before. These are suspected drug dealers. Michael Thomas has got a record, a very long record. And Amin Thomas also has a record. The fact that they're ñ Michael Thomas was the neighborhood wholesaler. I find that Mr. Spears is dressed in a business suit, standing in the barbershop without any sweat on his brow. That's the guy I'm talking about. I understand. The point I'm trying to make, Your Honor, is that the officer reasonably suspected anybody inside that building to be one of the drug dealers. It was ñ Does that give him the right to reach into Mr. Spears' pockets without Mr. Spears' permission? Your Honor, if I may, that particular argument would best be addressed to my co-counsel for Reno, since Officer Adamson did that.  We're splitting argument 50-50, is that right? We're arguing 50-50, yes, Your Honor. I'm sorry. I forgot to mention that. That's okay. So you're here on behalf of Sparks? I'm here on behalf of Sparks. And Officer Tracy. And Officer Tracy and the other defendants or appellees are represented by me. I'll withdraw the question, but save it for you. Okay. Okay. And who did the pat-down of Ms. May, the owner of the barbershop? Who asked that question? It would have been ñ if one was done, it would have been done by one of the Reno officers. So that's your question, too, then? Okay. And who handcuffed, allegedly, too tightly, Mr. Davis? The ñ Okay. Okay. At Reno, all ñ well, we only had two officers on scene that were relevant to this case, and they did the entry, and then they went and did the search of the interior portion. Counsel, if it'll help, I view the case of ñ I have the same concerns that Judge Fletcher has. So unless they implicate the Sparks defendants, maybe we ought to hear from counsel for Reno. Very good. Gladly. May it please the Court. Craig Skaw in the hot seat from the city of Reno. How did they pick this one gentleman to handcuff? Yeah. And let me address that. And I want to go person by person because I can't think they're all individual instances. And I guess I'll start with the first one out, who was, I believe, Ruby May. She may not have been first. But ñ oh, I need to address the videotape issue for you, please, if I may. Can you just lodge it with us? Do you have the CD with you? You may have a misimpression. It is not enhanced. The tape that was copied and given to the other attorneys before was copied tape to tape, and when we wound up doing a deposition and using one of those, it was not as clear as the one you received, the original. So we have the best there is? So you have the best there is. All right. Yes. Never mind. Yes. Okay. They just got copied in a different format. In any event, if we start with Ms. May, my officer was Sergeant Frazier, and the videotape does show that he is a very large gentleman. And he is facing into the front door. And as Ms. May is brought out, and he countermanded in order to have her go down onto the ground, she ñ Can you say that one more time? He countermanded in order to have her prone out, because he knew her. I see. And was she ever proned out then, if that's the phrase? That I don't know. I think there was some conflicting testimony about that. He did not have that impression. But in any event, he said, you don't have to do that. Yes. Okay. In any event, when she is brought out, she, in the videotape, is taken off to, from the camera angle, to the right side of it. Sergeant Frazier has his back to her. It looks like somebody pats her down. She was never handcuffed, but we don't know who patted her down. Despite my colleague saying it must have been City of Reno, it could have been anybody, because there were multiple agencies there, and we know it isn't anyone who's a defendant here. So some passerby could have been doing that? It could have been. The point is, is that Sergeant Frazier did not see that. There's no evidence that he saw her being patted down or authorized it. Patting down of Ms. May was done by your client or his client. What excuse was there for that? Maybe I should say justification. Well, let's remember that we don't have the defendant here who did it. The justification of a ---- There were two officers from Reno, Adamson and Frazier. Adamson is accounted for. He's with Mr. Spears. Frazier is accounted for. He was at the front door and then was with Mr. Davis and then was inside doing the sweep, if you will. So we've got a mystery, unidentified officer. It may or may not be one of the defendants who did this? There is no evidence that it's one of the defendants who did this. Well, let's go to the one that there's no dispute about, with Mr. Spears. Sure. With Mr. Spears, let's understand the circumstances, first of all. We have here a ---- and you're all familiar with the background, a considerable background of violence, drug writing and so forth. We have an officer, Tracy, who sees the events. Officer Tracy is providing cover, directing people out, and then he immediately goes inside. So Officer Adamson, who is my officer, winds up with Mr. Spears, does not know what Officer Tracy saw that is the reason for directing this. He can make assumptions. Under the collective knowledge doctrine he's going with, you know, and the briefing, he's got a pretty good idea what's going on, but he doesn't know specifically who it was or what it was that he saw. So we've got a suspect list. This person might be on the suspect list. We've also got a situation where people are running. This person might have been one of the runners who, and I want to point this out, the case that counsel cited for the proposition that the flashbang scared everyone, that very same case goes on to point out that, yeah, when the flashbang went off, this is the Marshall v. Teske case, the person, quote, ran like hell and he ran right to uniformed police officers for protection. He wasn't trying to get away from the police. He was trying to get to the police as fast as he could. This case is clearly distinguishable because these people ran away from the police when the flashlights or the headlights are coming their way. I diverged for a moment, but let's get back to the point here. The point is, is that we know, the officers know, that there was a lot of drug dealing going on that included people who were not on the suspect list. So all the people, so this person acting suspiciously may have been one of these other people who may have drugs, may have guns, and he doesn't know what the other officer saw. So his sergeant, Sergeant Frazier, ordered him to handcuff him, and it's reasonable under the circumstances because he doesn't know. He doesn't know for sure. He's got a dangerous situation where this person, even though he's in a suit and so forth, it's dark. This is a larger gentleman. My officer stands about this tall in the record, and this gentleman is substantially larger. Under those circumstances, to have him handcuffed and path-searched, because you can still reach a weapon even when you're handcuffed, makes sense for the very brief period of time that it was done. They needed to get these people away, but they didn't know still, until they did check out the suspect list and did the warrants check and had a chance to talk with him a little bit. Can I write that the officer then, at least there's evidence, that the officer then reaches into Mr. Spears' pockets without permission from Mr. Spears while handcuffed, after having done the pat-down? My understanding and recollection of the evidence, Your Honor, is that we do have a conflict in the testimony. Mr. Spears is saying, yes, he reached in without my permission. Mr. Officer Adamson says, no. So we may have an issue of fact on that one question. Assuming that we believe for purposes, present purposes, Mr. Spears' testimony, your evidence that says, I did not give him permission. Yes. He reached into my pockets. Any justification for that? I cannot find any justification for that. I can find justification for a pat-down, and if he finds weapons. So we may have a question of fact on that one issue that needs to be tried, and I don't like conceding such things, but there you have it. Can I make a comment on that? Sure. How about the tight handcuffs? No, the tight handcuffs. How about the allegedly tight handcuffs? Mr. Davis, assuming they were authorized to handcuff him in the first place, how about the tightness of the handcuffs? The tightness of the handcuffs, again, the videotape is pretty clear about there are no pushing, shovings, anything like that. There's no, like, ouch or anything like that going on. So the videotape does provide real good evidence that there's nothing unusual going on. The situation, of course, here, and there's no evidence that he was complaining that it hurt, that he complained, loosen my handcuffs, any of that kind of stuff. All that happened is he goes out and wins a world championship fight, goes to see a doctor, and he's got problems with his wrist that have been happening for years because he's a professional boxer. Now, he could have shaken hands with you or me and have that become symptomatic. What the doctor said is it would not take excessive force for that wrist to become symptomatic. So there is no evidence of excessive force here, even if he can be believed that it became painful here. There's no evidence that that was excessive force. If he says it was painful, then is it an issue of fact because we're at the summary judgment stage? No. No, it isn't. Just because something is painful does not mean it's excessive. And we have all these other indications that it was not excessive. The most we can say is it was painful. What if it's excessive in the sense that it really is too tight, but the evidence shows to us quite clearly that he doesn't do a great deal to alert the officer to that fact? How does qualified immunity kick in at what point? Well, and that's a good point, Your Honor, and I'd like to bring that up throughout this, is that the court never reached the qualified immunity question, but you would have to in order to reverse all of this, except perhaps on the hand-in-the-pocket idea. But in any event, the qualified immunity, an officer could reasonably believe that the handcuffs were on appropriately, particularly if the other person doesn't grimace, doesn't move, doesn't complain about it or ask for them to be loosened. How is the officer to know that they're too tight? And there was no evidence of that. There's only evidence that after the fact, he's complained that it became painful and required surgery, and he's now trying to pin a boxing career injury on this incident. Any other particular questions here? I think, again, with Mr. Spears and with the situation in total is, as Sergeant Frazier said, there were a lot of unknowns here, and we had to secure the situation, get these people out of the way so we could go in and search, and time was a critical factor here because they could be hiding evidence, they could be threatening the officers who were behind them. They had to take, as Michigan v. Summers says, command performance, I was thinking, but I think you remember the phrase. Yes, a command of the situation, a thorough command of the situation, and that provided safety for everyone. That allowed the officers to get them out of the way so they could get in to do what they needed to do. You said there was an issue of fact about reaching into the man's pocket. What's the officer's version of it? Officer's version of it is that never happened. He patted him down and then was given permission to take his wallet out, and that all assisted in the identification process, and they were satisfied he wasn't a suspect, and the victim was. Okay. So it happened the way it's supposed to. I should remember this. Was he handcuffed at that time, Mr. Spears? Yes. Yes, he was handcuffed, and then the two of them started talking. According to the officer, they started talking about it. Mr. Spears said, hey, we saw these people come in. We know you're after the drug people. Check out my I.D. So the two of them were both agreeable that would be a good idea to help clear up the situation. The Terry Court, Terry v. Ohio, the court noted that part of the reason for detention is to prove potential guilt. Also part of the reason is to prove potential innocence, and here that enabled the two of them to reach the conclusion he was innocent. He was kicked free. Counsel, is there any evidence in the record that anybody in the barbershop, the plaintiffs ever said to the police when they entered, hey, two guys just ran in here and they're hiding in the back? That created one of the problems for this case because, to the contrary, the testimony throughout here, the depositions, was that nobody came in or alternatively that two people walked in off the street like normal customers, and the plaintiffs here, the people in the front, never informed the police that anyone had come in or gone into the back, let alone run into the back and were hiding. So they contributed to the need for the plaintiffs here, contributed to the need for the officers to investigate the situation and failed to help clear it up. Thank you very much for your time. Thank you. Why don't we take a couple of minutes of rebuttal. Thank you. Let me ask you to start out then. Ms. Ruby Jean May, I just heard that we don't know who did it, except that we know that none of the defendants did it, is to say the pat-down. I bet you have a response to that. We don't know or they would have been alleged as a defendant. So you don't know that these guys, you have no evidence that these guys are the ones who patted her down? We believe it was a Reno police officer. We don't know the name. She was proned out. There is no dispute other than the police saying. And have you done discovery so you've asked these people? Oh, yes. Have you patted her down? They all say no and she says I can't identify who did it? There were 50 officers that were involved in this. And when they came into the barbershop and when they swarmed around, there were around seven or eight that came in. When in the parking lot there was between 20, 30, 40, there's an awful lot of officers. We didn't take everyone's deposition nor could we. She didn't recognize the name. Okay. So it sounds to me as though you just, I mean, even if the pat down was impermissible, it doesn't sound like you've got a cause of action because you don't know who did it. Well, I believe there is case law that say when a group of officers that are involved, if the other officers consent to are involved also in inappropriate behavior, that we have more of a problem with her. I will concede that, Your Honor. Okay. Okay. As to the issue as to whether or not she was proned out, she will say that she was proned out. She will say that she had a gun on her. All the other witnesses say the same thing. The difference with Ms. May was she was not handcuffed. That's not in dispute. Officer Frazier recognized her and so he According to her testimony, how long was she put in a prone position involuntarily? All of them were in a prone position involuntarily 10 to 12 minutes. Uh-huh. And she says they just came in, told us all to get down. That's correct. And the officers don't dispute that. Officer Tracy said he opened the door, he said, everybody down. She's standing there shaving the head of Mr. Davis, who has the cape on, and she says, I'm given a haircut, and he repeats several times, everybody down. He doesn't dispute that she got down. Counsel, at what point does the tape start? Do we know what the lapse is? It's dark. You have to Listen to my question. All right. I want to know when in the sequence of events the mobile command center with the roof-mounted video camera arrived. I don't know, Your Honor. It's quite a ways in. It's a difficult tape to watch. Bring some popcorn with you. You know, it's not It's a real-time tape, so we can tape, as apparently one of the police witnesses did, the sequence of events from the time the tape starts. Yes, I think you can. But what we're not able to estimate is the amount of time between when the people ran in the barbershop and when the tape began. That's right. Okay. Okay. I want to address Mr. Spears just very briefly, Your Honor. He certainly deserves summary judgment, and we're asking for it. Officer Tracy, Officer Adamson admitted that he had no reason to hold him in handcuffs after he knew that he was not on the suspect list. He said, when I asked what reason was there to hold him in handcuffs, after you know he's not on the suspect list, he says, absolutely none. And how long did he hold him in handcuffs, on your view of the evidence, after he knew that there was no reason? Approximately 10 minutes. At least. Minimal. And out of a total time in handcuffs? Total time was, I think he was released immediately after he checked him for warrants. We're saying that there was no reason to hold him in handcuffs to check for warrants when he's not on the suspect list. No, I understand. But my question was, you say that he was held in handcuffs approximately 10 minutes longer than he should have been. Correct. And I'm asking, how long was the total time during which he was held in handcuffs, including the time that you say he should not have been? 10 minutes, 10 to 12 minutes. Oh, so you're saying that he should not have been handcuffed at all? Absolutely, Your Honor. We're saying that the police had an absolute right to go into the barber shop to see if Michael Thomas was there, to look around. But you're saying then, maybe you're not saying this, but the logical consequence of what I think I just heard was, at the time they put him in handcuffs, they knew he was not on the suspect list. Is that correct? Sure. That's right. How did they know? Because he didn't match anything remotely. There were teenagers on the suspect list. He's 56 years old, a graying guy in a business suit. I see. So they didn't need to look at his ID to know that this is a respectable old man. That's correct. The suspect list had nobody remotely his age or description. Okay. With regard to Officer Tracy, or Frazier, immediately after this incident with the two tight handcuffs, we have evidence, and we submitted it, that he went to a physical therapist for weeks. He had a big tidal bout coming up. He feared going to a doctor, because if the other side ‑‑ there's betting on this. If the other side knew about this, this could cause some problems. So we have the evidence from the physical therapist, from other people, that he sought relief. The doctor also said, the doctor who gave him surgery ‑‑ Okay. You're now about two minutes, 20 seconds over. If you've got something to say, you want to wrap up in a minute or so, I'll give you that time. But we're in the wrap‑up phase. On a wrap‑up basis. All right. Judge Tallman asked me, what was it essentially that the police did wrong? Or what was the point of our argument? We were saying that it's a gross overreaction from the police. The handcuffing was improper, because none of our people remotely matched the description. The gun pointing at them was not for officer safety or for their safety. It enhanced the danger of the situation. And all of our witnesses, all of our plaintiffs will say, they didn't do a pat down. They went into the pockets. They physically went in and took out the insides. It was a gross overreaction, aggressive police tactics. Thank you, Your Honor. Thank you very much. Thank both sides for their helpful arguments in this case. That's our last case for the morning. Davis v. Addison now submitted for decision. And we are adjourned. Good morning.
judges: Fletcher, Tallman, Bertelsman